IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2020

**STATE OF TENNESSEE v. CHARLES GRIFFIN**

**Appeal from the Criminal Court for Shelby County**
**No. 15-01932      Chris Craft, Judge**
_____

**No. W2019-01561-CCA-R3-CD – Filed March 24, 2021**
_____

A jury convicted the Defendant, Charles Griffin, of first degree felony murder for a shooting committed during the course of a robbery.  The Defendant appeals his conviction, arguing that the evidence presented at trial was insufficient to convict him of first degree felony murder, that the trial court abused its discretion in allowing the State to introduce as evidence a photograph of the victim taken during the victim's lifetime, and that the court erred in denying his motion for DNA testing and a continuance.  After review of the record, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Ernest J. Beasley (on appeal), Memphis, Tennessee, and Jada Brisentine and Dan Johnson (at trial), Memphis, Tennessee, for the appellant, Charles Griffin.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Karen Cook and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence presented at trial showed that the victim, Mr. Virak Hean, and his wife, Ms. Houn Hourn, owned three jewelry stores in Memphis, Tennessee, the Raleigh, Perkins, and Lamar stores.  They bought and sold fine jewelry at their stores, as well as

provided loans for jewelry pawned to them. Their son, Mr. Mony Hy, worked in the stores occasionally and learned his parents' daily process for opening and closing the stores. The victim would open the stores one by one, starting with Raleigh, then Perkins, and ending with Lamar. Either Ms. Hourn or another employee would arrive after the victim opened a store so that the victim could go on to open the remaining stores. In the mornings, the victim opened the stores by unlocking the doors so employees could enter, removing jewelry from a safe on site, and placing jewelry out for display. Customers entered through a pair of access-controlled doors at the front of the stores. A barrier separated the retail counter from the back of the store, and customers would interact with store employees through designated windows. At closing, the victim locked the stores' entrances and returned the jewelry from the display cases to the safes.

On December 18, 2013, the victim opened the Perkins store and informed Ms. Hourn by telephone that he was leaving to open the Lamar store. Ms. Hourn informed the victim that she was about to arrive at the Perkins store, and she arrived to work at approximately 9:00 a.m. At 9:45 a.m., a man entered the Perkins store wielding a large, red backpack. He approached the counter window with items for sale and attempted to have Ms. Hourn open the window for him to hand her his backpack. However, Ms. Hourn did not open the window, instead convincing the man to take some of the contents out himself and display them to her for inspection through the glass. Ms. Hourn determined the items were costume jewelry. During Ms. Hourn's interaction with the man, a postal worker entered and exited the store. Ms. Hourn informed the man of her findings, and the man returned the items to his backpack and exited the store soon after.

The Lamar store customers, Ms. Terica Dickerson, Mr. Clarence Minnis, and Mr. S. L. Valentine, testified to attempting to enter the Lamar store between approximately 9:00 a.m. and 10:30 a.m., but no one let them inside the store. Mr. Valentine testified that a man came over to the Lamar store from across the street. The man looked inside the store and saw a man lying on the floor, and he called 911.

By 11:00 a.m. at the Perkins store, Ms. Hourn realized that she had not talked to the victim since earlier that morning. She and the victim regularly discussed business throughout the day. She called the Lamar store's telephone and the victim's cell phone, but he would not answer. Ms. Hourn asked her nephew to go check on the victim, and her nephew later informed her that a large number of customers were outside the store. Ms. Hourn went to the Lamar store after she talked to her nephew, and she found both customers and police outside the store.

Sergeant Cedric Curry of the Memphis Police Department responded to a possible man down call at the Lamar store during the afternoon on December 18, 2013. Sergeant Curry entered the Lamar store first, followed by his partner, members of the fire department, and paramedics. The group of emergency responders had to force their way in and walked through a hallway, at the end of which they found the victim lying on the

2

floor. Sergeant Curry observed gunshot wounds to the victim's chest. The paramedics tried to render aid, but they pronounced the victim dead on the scene. Sergeant Curry called his supervisor and contacted the homicide division.

Memphis Police Sergeant Michael Brown testified that he coordinated the investigation of the victim's murder. He directed a videographer to preserve video recorded by the store's surveillance system, and the surveillance video was admitted as evidence at trial.

At approximately 10:00 a.m. on December 18, 2013, surveillance cameras captured a man enter the second security door and walk into the main retail lobby. The man wore a hat, a dark coat covering a white-colored hooded jacket, dark pants, dark shoes, white-colored gloves, and a plaid scarf, and he wielded a red backpack over his right shoulder. The man approached one of the windows on the sales counter, dug through his backpack, pulled out a gun, and fired it at the victim on the other side of the counter. The man jumped across the counter and through the window and entered the area reserved for employees, taking his backpack with him. The man entered the back of the store through the window at approximately 10:01 a.m. The man stepped over the victim's body, and he carried his backpack over to a safe. Wielding a silver handgun with a black handle, the man tried but failed to open the safe. The man then stepped into an area which was behind the sales counter but concealed from the camera's view. The man jumped back through the counter window to the main retail lobby, carrying a red duffle bag in addition to his red backpack. The man appeared to place items into both the red duffle bag and the red backpack. The man jumped back across the counter to grab an object, and then appeared to place more items in the two bags, and he placed a chain with a large cross around his neck. As he exited the store, the man tried unsuccessfully to smash through a jewelry display case. The man walked toward the exit and concealed his gun in his clothing. The man exited the two front entrance doors at approximately 10:03 a.m. Still photographs were taken from the surveillance video, including photographs focusing on the man's appearance, and they were admitted as evidence at trial.

Sergeant Brown also obtained video captured by surveillance cameras on the exterior of a neighboring business, and that video was admitted as evidence at trial. Sergeant Brown recalled that the video showed the man exit the Lamar store and enter a red Pontiac car parked nearby. Sergeant Brown interviewed Mr. Majid Alyounis, who was waiting in the parking lot to begin work at the neighboring business. Mr. Alyounis arrived at work at 9:00 a.m., but he had to wait because the business was still closed. He waited there in his car until 10:15 a.m., and he watched a man carrying a red backpack and wearing a "cap" enter the passenger seat of a red Pontiac parked at the Lamar store. Mr. Alyounis identified the car in photographs admitted as evidence at trial, and he explained that he identified the make of the car by its rims. On cross-examination, Mr. Alyounis conceded that he was a "good distance away" from the red Pontiac and did not recognize any

distinguishing features about the man entering that car. Mr. Alyounis did not hear gunshots.

Inside the Lamar store, Memphis Police Sergeants Jason Parish and Sheila Green documented the crime scene. Photographs taken by Sergeant Parish and admitted at trial showed conditions of the scene, such as jewelry boxes lying on the floor, two shell casings, display cases that were opened and jewelry in display cases that appeared to be disturbed, an open window on the sales counter located above the victim's body, a wood cabinet possibly containing two bullet holes, a spent bullet, and a pile of jewelry on the floor. Sergeant Parish identified at trial the jewelry found in a pile on the floor, describing it as "costume-type jewelry." On cross-examination, Sergeant Parish admitted that forensic analysis of the crime scene did not return any additional evidence and that no firearm or clothing was found on the scene. Ms. Hourn was allowed to enter the scene at some point between 4:00 p.m. and 5:00 p.m., when she saw lying on the floor the costume jewelry that the man had tried to sell her at the Perkins store earlier that day. Sergeant Brown conceded on cross-examination that the jewelry was not tested for fingerprints, but he testified that it was not tested because it was unlikely a print could be successfully utilized from it. Ms. Hourn was given a photographic lineup that included the Defendant, but she could not identify him as the person whom she encountered at the Perkins store earlier that day. Sergeant Brown testified that the cash drawer at the Lamar store was open but that the cash inside had not been disturbed.

Sergeant Brown also collected as evidence video captured by surveillance cameras at the Perkins store, and the video surveillance as well as still images captured from it were admitted as evidence at trial. Sergeant Brown testified that video captured by an exterior surveillance camera showed a car that matched the red Pontiac observed at the Lamar store pull up to the Perkins store. Video captured by an interior camera also showed the interaction between Ms. Hourn and the man trying to sell her the costume jewelry. Sergeant Brown testified that the man captured by the Perkins surveillance camera appeared to be the same man involved in the victim's murder at the Lamar store. The clothing worn by the man in the Perkins store matched the clothing worn by the man who killed the victim. Sergeant Brown and other investigators concluded that the red car was a Pontiac, and they began searching for a similar make and model through police databases.

Memphis Police Sergeant Brad Webb investigated details about the red Pontiac and testified at trial that he believed the car to have been a 1997 Pontiac Grand Am, which he identified by its wheels. Sergeant Webb checked databases for incidents involving that make and model vehicle, and he found a traffic ticket issued to Mr. Christopher Woodland and associating him with Ms. Timbra Fleming. Sergeant Webb also found a reported domestic disturbance involving Mr. Woodland and Ms. Fleming at an address located in the Clementine apartments. Sergeant Webb testified that the Clementine apartments were approximately a five-minute drive from the Lamar store. Sergeant Brown visited the Clementine apartments and did not find the car, but he did talk to its registered owner, Ms.

4

Fleming. Further investigation led to a suspect known as "Little Charles." After receiving a crime stoppers tip and talking to the individual who made the tip, Sergeant Brown developed the Defendant as a suspect by name.

During Sergeant Brown's investigation relating to the suspects, he learned that the Lamar store issued customers pawn tickets. Sergeant Brown obtained three tickets from the Lamar store with the Defendant's name on them. The pawn tickets also contained the date the ticket was made, the Defendant's height, race, sex, and Tennessee driver's license number. On cross-examination, Sergeant Brown testified that law enforcement received about twenty-five to fifty crime stoppers tips, some containing the names of other individuals. Sergeant Brown conceded that he received a crime stoppers tip regarding a person named "Little Jerry," and he testified that he could not remember looking for a person by that name.

Sergeant Webb discovered that a red Pontiac Grand Am had been set on fire at the Clementine apartments, and Officer Stephen Matthews investigated the "burned out vehicle" there on December 18, 2013, at approximately 11:45 a.m. by taking photographs and preparing a memorandum. Sergeant Green also inspected the burned vehicle on December 20, 2013. She took photographs of the vehicle, but she could not identify a license plate or a VIN number on the vehicle. Later investigation of the vehicle revealed a VIN number that matched the ticket issued to Mr. Woodland.

Ms. Fleming lived at the Clementine apartments in December 2013 with her children and her boyfriend, Mr. Woodland. She owned a red 1997 Pontiac Grand Am GT. Ms. Fleming identified her vehicle at trial on the surveillance footage belonging to the business neighboring the Lamar store, testifying that she could see pictures "lined up on the driver's side" window. At approximately 7:00 a.m. on December 18, 2013, Mr. Woodland took Ms. Fleming's keys and left the apartment with a man who had come to the door. Ms. Fleming initially thought the person was a boy named "Mooney," but she looked through her window and recognized the man as "Little Charles." At trial, Ms. Fleming identified the Defendant as the person she knew as Little Charles. Mr. Woodland and the Defendant entered her vehicle. The Defendant wore "all black" clothing with a red shirt, a cap, and a plaid scarf, and he carried a red bag. At the time she first saw the Defendant with Mr. Woodland outside her apartment, he was not wearing gloves.

That day, detectives arrived at her apartment looking for "a computer and some books" but did not find those items. After the detectives left, Ms. Fleming observed Mr. Woodland and the Defendant approaching her apartment building. The Defendant was wearing the same clothes from earlier that day, but at that moment he wore a black pullover rather than the red shirt. The Defendant also then wore a big chain and carried a gas can. Ms. Fleming noticed smoke in the air coming from behind where Mr. Woodland and the Defendant were walking. She heard from the neighborhood that her vehicle had been burned. Mr. Woodland entered the apartment, but he left again with the Defendant in a

5

black sport utility vehicle Ms. Fleming had never previously seen. After they left, police kicked in Ms. Fleming's door, and she permitted them to search her apartment. The police searched for an hour, but they left without seizing anything. Ms. Fleming was brought to the police station and interviewed there early in the morning on December 19, 2013, where she gave a written statement and identified the Defendant in a photographic lineup.

On cross-examination at trial, Ms. Fleming conceded that she initially told police that the Defendant was wearing a plaid shirt. However, she testified that she meant to tell them that it was a plaid scarf instead. She agreed that she never informed police that the Defendant had a gas can with him. She did not know whether Mr. Woodland owned a gun, but she was aware that he was also charged in the case. Ms. Fleming agreed that she told police that she had seen Mr. Woodland and the Defendant again early on the morning of December 19, 2013, but she explained that she was mistaken because she was taken to give her statement to police at approximately 1:00 a.m. or 2:00 a.m. on December 19. Ms. Fleming testified that she told police she observed the person who came to her door when she did not actually observe that person at the door. She agreed that she had seen the names of the suspects before she gave her statement to police.

Memphis Police Detective Justin Tutor participated in the search for Mr. Woodland and the Defendant on December 19, 2013. Detective Tutor stopped the Defendant that night while the Defendant was driving a white car. While Detective Tutor and other law enforcement officers arrested the Defendant, Detective Tutor noticed the Defendant attempt to conceal a piece of jewelry in his sock. Detective Tutor recalled that they collected as evidence from the Defendant a bracelet and a watch, but he did not know if the jewelry was from the Lamar store. Detective Tutor could not recall at trial if the Defendant had other property on him at the time of his arrest. While he was being arrested, the Defendant said something about a robbery at a dice game and that he did not do it.

Memphis Police Sergeant Kevin Lundy assisted Sergeant Brown on the homicide investigation related to the victim's murder. Sergeant Lundy tagged evidence collected from the Defendant when he was arrested. Sergeant Lundy identified at trial $274 in cash, a watch, a bracelet, and an earring that he tagged as evidence. Sergeant Green examined the car in which the Defendant was arrested and found two cell phones, a bill of sale for the vehicle, and a bracelet and a stud earring. Sergeant Green testified that the stud earring she found in the car resembled the earring collected as evidence during the Defendant's arrest.

On December 19, 2013, at approximately 9:45 p.m., Officer Mundy Quinn and Detective Fausto Frias interviewed the Defendant. When Officer Quinn asked the Defendant whether he knew why he was being interviewed, the Defendant stated that he had been pulled over after being involved in a dice game. Officer Quinn confronted the Defendant with the facts that he was hiding a diamond bracelet in his sock, resisted when an officer patted him down, and that a watch fell out of his pocket. The Defendant

6

responded that he did not rob anybody at the dice game. The Defendant stated that he had $400 in cash on his person and that he got the cash and jewelry found on his person at a dice game. He also denied being at the Clementine apartments and denied knowing Mr. Woodland. The Defendant denied ever being in a pawnshop and denied robbing or killing anyone.

Sergeant Brown entered and informed the Defendant that employees had identified jewelry on the scene as jewelry he attempted to sell. The Defendant said, "[S]he didn't identify me," when the gender of the employees was never mentioned. The Defendant informed the interviewers that he wore black clothes and had a red backpack, but he denied ever changing his clothes on the day of the robbery. He eventually confessed that he was in a red Pontiac Grand Am with a person named Christopher Wallace. Officer Quinn testified that the Defendant also stated that "Christopher was driving." The Defendant also confessed to going into the Lamar store and pointing a gun at the victim. Officer Quinn recalled that the Defendant told him and Detective Frias that the gun "just went off, it went pow . . . pow." The Defendant confessed to taking a chain with a large cross from the Lamar store, and he admitted to giving $1,000 to the person named Christopher. The Defendant also identified himself in a still photograph taken from the Lamar store surveillance video. He refused to give a written statement, and Officer Quinn terminated the interview.

On cross-examination, Officer Quinn testified that the interview was surveilled by cameras for security purposes but that the department's policy was to not record the interviews that took place. Accordingly, Officer Quinn conceded that there was no recording of the Defendant's confession. Officer Quinn stated that law enforcement preferred to obtain a written statement, but since he was not able to obtain one from the Defendant, he was testifying regarding the interview from his own memory. Officer Quinn agreed that he viewed video from the Lamar store prior to the interview, but he could not recall whether he saw a cash drawer open. Officer Quinn did not ask the Defendant about the location of the murder weapon, the clothes he wore during the robbery, the jewelry taken from the store, or the red backpack. Officer Quinn testified on redirect-examination that, once the Defendant indicated he no longer wanted to answer questions, Officer Quinn stopped asking him questions. Sergeant Brown testified that the Defendant's address found on the pawn tickets was never searched. Law enforcement never found any of the clothes the Defendant wore, the red backpack, or the gun used in the robbery.

Dr. Erica Curry, a medical examiner and expert in forensic pathology, examined the victim's body after the murder. She observed two gunshot wounds, the first being one on the left front shoulder and upper chest and the second being one on the lower left chest. The first gunshot wound fractured the Defendant's left collar bone and the rib underneath it and injured the top part of his left lung. Dr. Curry also observed stippling on the wound, but it had no soot. From this observation, she concluded that the gun was fired from a distance between six inches and three feet from the victim. Dr. Curry determined that the

7

first wound could have caused the victim's death without immediate medical attention. The second gunshot wound went through the victim's eighth rib on the front of his torso and injured the victim's left lung, heart, liver, stomach, aorta, and it exited through a rib on the left side of his back. Dr. Curry opined that the victim was unlikely to have survived the second gunshot wound. Dr. Curry testified that the victim was otherwise healthy and not under the influence of drugs or alcohol. She determined the cause of the victim's death to be multiple gunshot wounds and the manner of his death to be homicide.

At the conclusion of the trial, the jury found the Defendant guilty of first degree felony murder committed in the perpetration of a robbery. The trial court sentenced the Defendant to life imprisonment. The Defendant appeals the outcome of his case on three grounds: (1) the evidence was insufficient to support his first degree felony murder conviction; (2) the trial court abused its discretion in allowing the State to introduce a photograph of the victim taken during the victim's lifetime, and (3) the court erred in denying his motion for DNA testing and a continuance.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient to support his conviction for first degree felony murder. The Defendant cites *State v. Crawford*, 470 S.W.2d 610 (1971) *overruled by State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), contending that the evidence presented at trial was only circumstantial and did not identify him as the person who committed victim's murder. The State argues that the evidence was sufficient to convict the Defendant of first degree felony murder.

Reviewing the sufficiency of the evidence supporting a criminal conviction requires this court to first "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." *State v. Stephens*, 521 S.W.3d 718, 723 (Tenn. 2017). Next, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If the evidence is insufficient to support the finding of guilt beyond a reasonable doubt made by the trier of fact, its finding of guilt "shall be set aside." Tenn. R. App. P. 13(e). Once a defendant has been convicted, the presumption of innocence is replaced with a presumption of guilt on appeal. *Turner v. State*, 394 S.W.2d 635, 637 (Tenn. 1965). To overcome a presumption of guilt on appeal, the defendant bears the burden of showing the evidence presented at trial was "insufficient for a rational trier of fact to find guilt of the defendant beyond a reasonable doubt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982) (citing *State v. Patton*, 593 S.W.2d 913 (Tenn. 1979)).

The State "is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence." *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This court may not reweigh or reevaluate the evidence, because "[q]uestions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* at 236 (citing *Bland*, 958 S.W.2d at 659). After a guilty verdict has been entered, the testimony of the State's witnesses is accredited, and all conflicts in the testimony are resolved in favor of the theory of the State. *State v. Nichols*, 24 S.W.3d 297, 301 (Tenn. 2000) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).

A defendant's guilt may be found beyond a reasonable doubt supported by direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). We previously applied a stricter standard for convictions supported by circumstantial evidence alone, requiring that "[a] web of guilt . . . be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Crawford*, 470 S.W.2d at 613. However, the Supreme Court in *State v. Dorantes*, overruled the *Crawford* standard, and we now review sufficiency claims under the same standard irrespective of whether the evidence supporting the conviction is direct or circumstantial. 331 S.W.3d 370, 379, 381 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Here, the Defendant was convicted of first degree felony murder. The crime of first degree felony murder in the context of the theory pursued by the State in this case required the State to prove that the Defendant killed the victim "in the perpetration of or attempt to perpetrate" a robbery. T.C.A. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. A person acts "intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a).

Viewing the evidence in the light most favorable to the State, the Defendant visited Ms. Fleming's apartment on December 18, 2013, and Mr. Woodland drove the Defendant to the Perkins store in Ms. Fleming's red 1993 Pontiac Grand Am GT. The Defendant entered the store at approximately 9:45 a.m. and tried to sell Ms. Hourn costume jewelry. The Defendant wore a baseball cap, a dark coat covering a white-colored hooded jacket, dark pants, dark shoes, white-colored gloves, and a plaid scarf, and he carried a red backpack. The Defendant tried to convince Ms. Hourn to open the counter window, Ms. Hourn refused to open the window and refused to purchase his costume jewelry, and the Defendant exited the store soon after a witness entered and exited the store.

9

After the Defendant left the Perkins store, Mr. Woodland drove him to the Lamar store. The Defendant entered the Lamar store at approximately 10:00 a.m. wearing the same clothes and carrying the same backpack. He approached the sales counter, dug through his backpack, pulled out a gun, and shot the victim twice in the torso. The Defendant filled his backpack and an additional bag with items from the Lamar store, and he took a chain with a large cross on it. Ms. Fleming saw the Defendant wearing a chain and carrying a gas can as he and Mr. Woodland approached Ms. Fleming's apartment after Ms. Fleming's car was set on fire nearby. The Defendant later confessed to Officer Quinn and Detective Frias that he took a chain with a large cross on it from the Lamar store, that he accidentally shot the victim in the process, that a person named Christopher drove the car, and that he paid Christopher $1,000. The Defendant identified himself in a still photograph taken from the Lamar store's surveillance video. Ms. Hourn identified costume jewelry found on the floor at the Lamar store as the same jewelry the Defendant tried to sell her at the Perkins store earlier that day. The Defendant was found in possession of jewelry at the time of his arrest.

The Defendant complains that the above evidence was only circumstantial, citing *Crawford* for the proposition that such evidence was insufficient to convict him of first degree felony murder. 470 S.W.2d at 613. The Defendant's argument fails to recognize that the "web of guilt" standard utilized in *Crawford* was overruled nearly a decade ago by the Tennessee Supreme Court in *Dorantes*, 331 S.W.3d 370. Following the *Dorantes* opinion, circumstantial evidence alone is sufficient to support a defendant's conviction if it provides sufficient proof for any rational trier of fact to find the defendant guilty beyond a reasonable doubt. *See Dorantes*, 331 S.W.3d at 379-81. Additionally, the record contains direct evidence of surveillance footage taken from the Perkins store, the Lamar store, and the business neighboring the Lamar store, as well as the Defendant's confession to law enforcement. The evidence in this case overwhelmingly showed that the Defendant shot the victim twice in the torso while holding him at gunpoint in the course of robbing the Lamar store, taking from it among other items a chain with a large cross on it. *See* T.C.A. §§ 39-13-401, 39-11-302, 39-13-202(a)(2).

## II. The Admission of the Victim's Life-In-Being Photograph as Evidence

The Defendant contends that the trial court erred in admitting as evidence a photograph of the victim taken while the victim was alive. The Defendant cites the Federal Rules of Evidence, arguing that the admission of the life-in-being photograph should have been excluded under Rule 403 on the basis that its prejudicial effect substantially outweighed its probative value. He additionally cites *State v. Adams* 405 S.W.3d 641 (Tenn. 2013), for the proposition that a photograph admitted for the purpose of showing

the existence of a life-in-being when that issue is uncontroverted is error, and he cites *State v. Banks*, 564 S.W.2d 947 (Tenn. 1978), for the proposition that a new trial may be ordered when a trial court fails to balance the probative value of evidence against its prejudicial effect. The Defendant claims that the admission of the photograph elicited "some emotional reactions from those watching the trial" that "likely prejudiced" him. The State contends that the trial court properly admitted the photograph within its broad authority to do so under the Tennessee Rules of Evidence. The State argues that the photograph was relevant to show the victim's appearance and condition prior to his death and that the photograph was not unfairly prejudicial. The State argues that the photograph "does not feature any embellishments . . . that could be considered prejudicial."

The trial court in a pre-trial hearing considered the admissibility of the life-in-being photograph of the victim which the State sought to introduce as evidence. At the hearing, the Defendant argued that the photograph of the victim appeared "memorial," lacked relevance to the issues, and served to "garner sympathy." The State argued that the photograph was relevant because it depicted the victim as he appeared before he died, and it argued that the photograph was not prejudicial. In its discussion with the trial court, the State explained that the photograph was originally displayed on a wall in the Lamar store. The trial court described the photograph in the following way:

> Okay. This is a picture of a man with a black shirt and a black tie in a frame so apparently it was a picture taken . . . that was on the wall.
>
> . . .
>
> It doesn't have a white collar like he's a priest or anything like that. There's no angel wings and there's no halo. Although there is a little light background, there's no halo.

The trial court found that the photograph was probative because it showed "a life in being," noting that that was something the State had to prove. The trial court also found that the photograph was not unfairly prejudicial, describing the photograph as a "plain ordinary photograph of [the victim] in a shirt and tie." The trial court denied the Defendant's motion in limine and permitted the State to admit the photograph as evidence at trial.

A trial court's decision about the admissibility of evidence is reviewed for an abuse of discretion. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015) (citing *State v. Parker*, 350 S.W.3d 883, 896-97 (Tenn. 2011). A reviewing court "'will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *Parker*, 350 S.W.3d at 897 (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

Our courts have historically disfavored the State's introduction of life-in-being photographs depicting the victim's appearance before death because they "lack relevance to the issues on trial and because of their potential to unnecessarily arouse the sympathy of the jury." *Adams*, 405 S.W.3d at 657. However, following the *Adams* opinion, the General Assembly made life-in-being photographs admissible in homicide cases "when offered by the district attorney general to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(c); *see State v. Glen Allen Donaldson*, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020) (holding that the life-in-being photograph "was relevant to show the victim's general appearance while alive" even though "the victim's identity was not at issue"), *perm. app. denied* (Tenn. Sept. 16, 2020). In the present case, the State offered the life-in-being photograph as evidence to show the victim's appearance before his death, and the trial court allowed the photograph to be admitted as evidence. Section 40-38-103(c) expressly permitted the State to introduce the photograph for its stated purpose.

When a life-in-being photograph is offered for admission to evidence, "the trial court retains the discretion to determine whether" it is "appropriate." *Glen Allen Donaldson*, 2020 WL 2494478, at *10; T.C.A. § 40-38-103(c). A trial court may exclude relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. "Unfair prejudice" is "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. McCaleb*, 582 S.W.3d 179, 188 (Tenn. 2019) (quoting Federal Rule of Evidence 403, Advisory Comm. Notes; *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)).

The trial court did not abuse its discretion by permitting the State to enter the life-in-being photograph into evidence. We first note that the Defendant's citation to *Banks*, 564 S.W.2d 947, in support of his argument is unpersuasive. The Defendant quotes from *Banks* the Supreme Court's statement that "[t]here is authority for reversing a conviction for failure of the trial judge to weigh the probative value of photographs against their prejudicial effect." *Banks*, 564 S.W.2d at 952. In the present case, the trial court conducted a Rule 403 balancing analysis. As we discussed above, the trial court considered the light in the background of the photograph and the black clothing worn by the victim, but it found that there was nothing unfairly prejudicial about the photograph. Accordingly, it found that the probative value of the photograph was not substantially outweighed by unfair prejudice. The Defendant fails to show on appeal how the trial court abused its discretion in making those findings. *See Glen Allen Donaldson*, 2020 WL 2494478, at *10 (holding that the life-in-being photograph was not prejudicial when "[t]he photograph show[ed] the victim standing alone in a suit and smiling at the camera"). The Defendant is not entitled to relief on this issue.

The Defendant also claims that the life-in-being photograph was prejudicial because it elicited emotional responses from individuals observing the trial, including one of the State's witnesses. However, the Defendant does not provide citations to the record to

12

support this claim, and the record does not reflect the individuals' emotional responses. We conclude that this argument is waived on appeal. *See* Tenn. R. App. P. 27(a)(7)(A) (requiring an appellant's brief to contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### III. Request for DNA Testing and Related Continuance

The Defendant also complains that the trial court denied his request for DNA testing and for a related continuance. Neither the Defendant's request for DNA testing nor the trial court's order denying his request is part of the appellate record. *See* Tenn. R. App. 24(a). Additionally, the Defendant does not cite to the record of the trial court's denial of his motion, nor does he cite to any relevant legal authority supporting his position. *See* Tenn. R. App. P. 27(a)(7)(A); *see also* Tenn. Ct. Crim. App. R. 10(b). We conclude that the Defendant has waived this argument. Therefore, the Defendant is not entitled to relief.

### CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE